UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA (MIAMI)
CASE NO. 95-CR-314-LENARD

UNITED STATES OF AMERICA   )
                           )
v.                         )
                           )
RAUL ISRAEL                )
_____)

**MR. ISRAEL'S RENEWED MOTION FOR COMPASSIONATE RELEASE BASED ON NEW EVIDENCE AND RECORDS; OR, IN THE ALTERNATIVE, HIS SECOND MOTION FOR COMPASSIONATE RELEASE; AND HIS UNOPPOSED MOTION FOR EXPEDITED BRIEFING**

Mr. Israel, through counsel, moves this Court to grant his renewed motion for compassionate release under Fed. R. Civ. P. 59(e) and 18 U.S.C. § 3582(c)(1)(A);[1] or in the alternative, grant his second motion for compassionate release. Since this Court's order on July 10, 2020, (DE445), denying his motion for compassionate release (DE432), the following new evidence has come to light: (1) Mr. Israel, who is 76-years-old, **is now infected with COVID-19** that he contracted at FCI Miami; (2) BOP produced Mr. Israel's most recent medical records pursuant to this Court's order (DE447), which demonstrate that Mr. Israel **currently** suffers from: COVID-19; hyperlipidemia; hypertension; pneumonia; and obesity unspecified—most of which are additional CDC increased risk factors, and were not previously known to the undersigned, and therefore, not previously presented to this Court; and finally, (3) **the pandemic is ripping through FCI Miami**,

---

[1] *See United States v. Vasquez Torres,* Case No. 19-cr-20342-Bloom, DE58 (S.D.Fla. July 10, 2020) (granting renewed motion for compassionate relief where, after court's initial denial, defendant (1) contracted COVID-19 and (2) the government's policy changed to allow it to concede "extraordinary and compelling" reasons exist where defendants have CDC factors).

which has reported 106 cases as of July 21, 2020.[2] AUSA Frank Tamen, who opposes Mr. Israel's release, does not oppose Mr. Israel's request for expedited briefing of this case.[3]

**1.    BOP produced Mr. Israel's most recent medical records pursuant to this Court's order (DE447), which demonstrate that Mr. Israel currently suffers from: COVID-19; hyperlipidemia; hypertension; pneumonia; obesity unspecified—most of which are additional CDC increased risk factors.**

Mr. Israel has contracted COVID-19 at FCI Miami. Attached as Exhibit 1 are current BOP medical records, which show that as of July 6, 2020, FCI Miami suspected he was infected. Ex.1 at 1. His symptoms included a "productive cough" with "clear phlegm" and a "scratchy throat." Ex.1. at 2. He was given a COVID-19 test with results to return on July 13, 2020. Ex.1. at 1. Although he was placed into isolation on July 6th as a precaution, he had likely already spread the disease to others guards and inmates. This is because his symptoms had already been present for "2 days" (Ex.1 at 2), and a person is infectious to others at least during the 48 hours before he develops symptoms.[4]

On July 13, 2020, the test results confirmed that he was COVID-19 positive. Ex.1 at 5. Yet, despite being placed in isolation on July 6th, the records indicate Mr. Israel was not seen until July 15th. Ex.1 at 3. At that point, he was described as having "general malaise" and "poor appetite." Ex.1 at 3. He has been treated with acetaminophen and has not reported additional symptoms as

---

[2] In denying Mr. Israel's initial motion for compassionate release, which was based solely on his advanced age and prior heart attack and open heart surgery, the Court cited (DE445): his failure to provide current medical records, which he has now received; his failure to exhaust by filing before a 30-day lapse, which has now been exhausted; and his failure to show COVID-19 presents "a major threat at FCI Miami," which now can be shown based on the most recent BOP numbers and staff complaints.

[3] Pursuant to Local Rule 7.1(d), the basis for expediting this motion is that Mr. Israel has now contracted COVID-19 and faces imminent and serious health risks. The Parties have conferred and agreed to the following proposed briefing schedule: seven (7) days for the government's response and three (3) days for Mr. Israel's reply. A proposed order is attached.

[4] https://www.health.harvard.edu/diseases-and-conditions/if-youve-been-exposed-to-the-coronavirus.

of July 17th, the last date in the records. Ex.1 at 6. FCI Miami never informed Mr. Israel's family or counsel of his diagnosis, nor has Mr. Israel been able to contact his family since July 9th. Undersigned has requested a legal call with him and is pending scheduling from FCI Miami.

In addition to contracting COVID-19 while at FCI Miami, the records also show he currently suffers from: hyperlipidemia; obesity unspecified; anemia; hypertension; pneumonia; and abnormal blood chemistry indicating his A1c is high (an indicator of diabetes). Ex.1 at 4-5.  His active prescriptions include: acetaminophen; aspirin; atorvastatin; and spironolactone. Ex.1 at 6-7. While the records indicate that his "open heart surgery" is current, his "CABG" or coronary artery bypass graft[5] is marked as in remission as of February 8, 2019. Ex.1 at 5. His medications of atorvastatin and spironolactone are ongoing and treat heart disease, cholesterol, and high blood pressure, as well as reduce the risk of heart attack.[6] As demonstrated by these up-to-date records, and explained more fully below, these documented illnesses, along with his age, support that Mr. Israel is at greater risk for developing life-threatening and serious complications due to his COVID-19 infection.

**2.      In light of these medical records, Mr. Israel has established that there exist "extraordinary and compelling reasons" to grant his compassionate release.**

Either as a renewed motion for compassionate release or as a second motion for the same relief,[7] these newly-obtained medical records establish "extraordinary and compelling reasons" to

---

[5] https://www.nhlbi.nih.gov/health-topics/coronary-artery-bypass-grafting (used in emergency for severe heart attack).

[6] *See* https://www.webmd.com/drugs/2/drug-841/atorvastatin-oral/details; and https://www.webmd.com/drugs/2/drug-6288/spironolactone-oral/details.

[7] *See* 18 U.S.C. § 3582(c)(1)(A) (defendant may file a motion for compassionate release on his own behalf only after "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier"). Here, more than 30 days has lapsed since Mr. Israel's March 30, 2020, request (DE438). Thus, should this motion be construed as a second motion, it is properly before the Court.

grant Mr. Israel release. The CDC explains the factors and comorbidities that increase the likelihood of death, many of which Mr. Israel has:

> **Age** is a strong risk factor for severe illness, complications, and death. Among more than 44,000 confirmed cases of COVID-19 in China, the case fatality rate was highest among older persons: ≥80 years: 14.8%, 70–79 years: 8.0%, 60–69 years: 3.6%, 50–59 years: 1.3%, 40–49 years: 0.4%, <40 years: 0.2%. Early U.S. epidemiologic data suggests that the case fatality was highest in persons aged ≥85 years (range 10%–27%), followed by **3%–11% for ages 65–84 years**, 1%–3% for ages 55–64 years, and <1% for ages 0–54 years.
>
> Patients in China with no reported underlying medical conditions had an overall case fatality of 0.9%, but case fatality was higher for patients with comorbidities: **10.5% for those with cardiovascular disease, 7.3% for diabetes,** and approximately **6%** each for chronic respiratory disease, **hypertension,** and cancer. Heart disease, **hypertension**, prior stroke, diabetes, chronic lung disease, and chronic kidney disease have all **been associated with increased illness severity and adverse outcomes.** Accounting for differences in age and prevalence of underlying condition, mortality associated with COVID-19 in the United States was similar to China.[8]

An early World Health Organization report on COVID-19 found "[i]ndividuals at highest risk for severe disease and death include people aged over 60 years and those with underlying conditions such as hypertension [and] cardiovascular disease."[9] While the preliminary overall fatality rate in the report was 3.8%, the fatality rate for people with hypertension was 8.4%.[10] The CDC has also found "[h]eart disease, *hypertension*, prior stroke, diabetes, chronic lung disease, and chronic kidney disease have all been associated with increased illness severity and adverse

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (emphasis added) (last accessed May 14, 2020).

[9] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronavirus/who-china-joint-mission-on-covid-19-final-report.pdf.

[10] *Id. See also* Anna Medaris Miller et al., *10 common health conditions that may increase risk of death from the coronavirus, including diabetes and heart disease*, Business Insider (Mar. 23, 2020), https://www.businessinsider.com/hypertension-diabetes-conditions-that-makecoronavirus-more-deadly-2020-3 (noting 76% of people in Italy who died from COVID-19 had hypertension).

outcomes."[11] Multiple studies have shown a strong correlation between hypertension and severe complications from COVID-19 infection. One CDC study found 49.7% percent of hospitalized patients also suffered from hypertension.[12] A second study of such patients in New York City found 56% of them suffered from hypertension,[13] and a third study found 50% of those who died in Wuhan had hypertension.[14] Thus, courts have granted compassionate release to defendants who only have hypertension.[15]

Even if his current COVID-19 infection does not kill him, Mr. Israel will suffer the consequences of this infection for whatever remains of his life. Many patients with preexisting conditions who develop COVID-19 and do not die will still experience severe illness and require hospitalization. "Most people in the higher risk categories" who contract COVID-19 "will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires highly specialized equipment in limited supply as well as an entire team of care providers, including but not limited to 1:1 or 1:2 nurse to patient ratios,

---

[11] CDC, Coronavirus Disease 2019 (COVID-19), "Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)," updated Jun. 2, 2020 at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (emphasis added).

[12] CDC, Morbidity and Mortality Weekly Report (MMWR), (Apr. 17, 2020) at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

[13] Safiya Richardson, MD, MPH, *et al*, *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, JAMA Network (Apr. 22, 2020) at https://jamanetwork.com/journals/jama/fullarticle/2765184.

[14] Todd Neale, *New Wuhan Data Confirm High Hypertension Rate in COVID-19 Deaths*, tctMD, (Apr. 10, 2020), at https://www.tctmd.com/news/new-wuhan-data-confirm-high-hypertension-rate-covid-19-deaths.

[15] *See e.g., United States v. Sawics*, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020)(Ross, J.)(granting compassionate release to defendant convicted of possession of child pornography who was being treated for hypertension); *United States v. Soto*, 2020 WL 2104784 (D. Mass., May 1, 2020)(granting compassionate release to defendant with hypertension); *see also United States v. Scparta*, 2020 WL 1910481, at *9 (S.D.N.Y., Apr. 20, 2020)(finding hypertension to be a comorbidity that increases the risk of death from COVID-19); *Basank v. Decker*, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020)(noting that hypertension increases risk of harm from COVID-19).

respiratory therapists and intensive care physicians." Ex.2 at ¶6 (Golob Declaration).[16] "For high risk patients who do not die from COVID-19, a prolonged recovery is expected to be required, including the need for extensive rehabilitation for profound deconditioning, loss of digits, neurological damage, and loss of respiratory capacity." *Id*. ¶4.[17] Thus, if the disease follows this trajectory for Mr. Israel, he would be rendered unable to independently function within the prison.[18]

While Mr. Israel's current records as of July 17, 2020, indicate that he currently has "obesity unspecified," based on his height and weight in in February 2020, his body mass index was less than 30. Ex.1 at 4,8. Because obesity is an increased risk factor according to the CDC,[19] undersigned will address it here. In addition to age and hypertension, the first peer-reviewed, large-

---

[16] Dr. Golob's declaration, as well as the other doctors' declarations cited in this motion, were prepared in connection with different cases and are attached here for informational purposes.

[17] *See also* Ling Mao, et al., *Neurologic Manifestations of Hospitalized Patients With Coronavirus Disease 2019 in Wuhan, China,* JAMA Neurol., (Apr. 10, 2020); https://jamanetwork.com/journals/jamaneurology/fullarticle/2764549.

[18] Indeed, even if his current bout with COVID-19 resolves, Mr. Israel will not be out of the woods. The WHO has concluded that there is "currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection." World Health Organization, *"Immunity Passports" in the context of COVID-19* (Apr. 24, 2020), *available* https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19. The CDC says the same: "The immune response to COVID-19 is not yet understood. Patients with MERS-CoV infection are unlikely to be re-infected shortly after they recover, but it is not yet known whether similar immune protection will be observed for patients with COVID-19." Centers for Disease Control, Coronavirus Disease 2019, *available* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

And even in those who develop an immune response, at least with other coronaviruses, "immunity seems to wane quickly." Antonio Regalado, *What if immunity to covid-19 doesn't last?*, MIT Tech. Rev. (Apr. 27, 2020), *available* https://www.technologyreview.com/2020/04/27/1000569/ how-long-are-people- immune-to-covid-19/. Because we have only about six months of experience with COVID-19, "little is known yet about the body's immune response to an infection. . . . 'That's something that's going to take a while to figure out.'" said George Rutherford, the head of infectious disease and global epidemiology at the University of California San Francisco. Kristen V. Brown, *Coronavirus Survivors Hope for Immunity—The Reality is More Complicated*, Bloomberg (Apr. 14, 2020), https://www.bloomberg.com/news/articles/2020-04-14/do-coronavirus-survivors-have-immunity-from-reinfection-maybe.

[19] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity.

6

scale study of American COVID-19 hospital patients confirmed that people with hypertension and obesity are at greater risk for serious COVID-19 complications.[20] Among hospitalized patients, 57% had high blood pressure and 41% were obese. *Id*. Mr. Israel's medical records indicate he has hypertension and obesity. Ex.1 at 4. If Mr. Israel is just shy of obesity, then that factor, in conjunction with his established hypertension, can be considered by this Court as placing him at increased risk of medical complications. *See United States v. Hilow,* 2020 WL 2851086, Case No. 15-cr-170 (S.D.N.H. June 2, 2020) (granting compassionate release to defendant with high blood pressure and borderline obesity). If Mr. Israel is obese, then it is a factor that the CDC has determined *independently* places him at increased risk.

Similarly, Mr. Israel's BOP records state that as of 2018, he had "a history of type 2 [mellitus diabetes]," (Ex.1 at 9) and the most recent July 17, 2020, list of current problems indicates abnormal blood chemistry with elevated A1c (Ex.1 at 5). Thus, undersigned will address this factor as well. Type 2 diabetics have "reduced immunity derived from their type 2 diabetes." Ex.3 at ¶11 (Edelman Affidavit). According to the CDC, Type 2 diabetics are at increased risk for serious complications should they become infected.[21] Further, those with diabetes are far more likely to suffer from COVID-19 related complications, including death; the CDC puts the risk of death for those with diabetes at a staggering 7.3%. Death due to COVID-19 infection is more likely for

---

[20] Safiya Richardson, Jamie S. Hirsch, Mangala Narasimhan, et al, "Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area," *Journal of American Medical Ass'n*, (Apr. 22, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2765184.

[21] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#diabetes.

those with diabetes because viral infection makes them more susceptible to diabetic ketoacidosis, which occurs when the body breaks down fats too quickly, and pneumonia.[22]

Mr. Israel's records also indicate a current diagnosis of pneumonia. Ex.1 at 5. And as outlined above, his age, current contraction of COVID-19, and hypertension are high-risk comorbidities in his case. The additional indications of obesity and Type 2 diabetes only worsen his possible outcome—both short and long term. The startling statistics cited above mean that there is now a "substantial risk" that, unless the Court grants compassionate release, Mr. Israel will, "with an unsettlingly high degree of probability, serve a life sentence." *United States v. Bess*, No. 1:16-cr-156, 2020 WL 1940809, at *10, (W.D.N.Y. Apr. 22, 2020) (granting compassionate release). These are "extraordinary and compelling" reasons for release. Indeed, as one court recently concluded, "[n]o rationale is more compelling or extraordinary." *United States v. Foster*, No. 1:14-cr-324-02, DE191, at 10 (M.D. Pa. Apr. 3, 2020).

Though not binding on the Court,[23] the Sentencing Guidelines' compassionate release policy statement provides, in pertinent part, that extraordinary and compelling reasons include:

---

[22] *Infections in patients with diabetes mellitus: A review of pathogenesis.* Juliana Casqueiro, Janine Casqueiro, and Cresio Alves, Indian J. Endocrinol. Metab. 2012 Mar. 16 (Suppl1): S27–S36, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3354930/ (last accessed May 14, 2020).

[23] Guidelines are never mandatory. *See United States v. Booker*, 543 U.S. 220 (2005). Moreover, because § 1B1.13 has not been updated to reflect the First Step Act's significant expansion of compassionate release under § 3582(c)(1)(A), several courts have determined that the policy statement on compassionate release, while helpful, does not strictly constrain the Court's determination of "extraordinary and compelling reasons" for § 3582(c)(1)(A) motions filed after the First Step Act. See *United States v. Hope*, No. 90-cr-06108-KMW, DE 479:3-5 (S.D. Fla. April 10, 2020), appeal pending, No. 20- 11773 (11th Cir.) (collecting cases agreeing that courts independently decide what constitutes "extraordinary and compelling," reasons under-post FSA § 3582(c)(1)(A)(i)); *United States v. Redd*, 2020 WL 1248493, *6 (E.D. Va. Mar. 16, 2020) (§ 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants, and therefore "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'); *Coleman v. United States*, 2020 WL 3039123, at *2 (E.D. Va. June 4, 2020) ("U.S.S.G. § 1B1.13 is now outdated following the passage of the First Step Act, which allows individuals to petition the

> (A) Medical Condition of the Defendant. . . (ii) The defendant is—suffering from a serious physical or medical condition . . . [or] experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant. The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less . . .

U.S.S.G. § 1B1.13, cmt. n.1. The commentary also includes a catch-all provision for "an extraordinary and compelling reason other than, or in combination with," subsections (A) and (B). *Id.* at cmt. n.1(D).

In the instant case, Mr. Israel satisfies both subsections (A) *and* (B) of the Guidelines. As discussed above and relevant to subsection (A) of the Guidelines, Mr. Israel's COVID-19 illness, combined with his other serious medical conditions, diminish his ability to provide self-care in the prison, and he is unlikely to recover from the short and long term effects. Per subsection (B) of the Guidelines, he is: 76 years old; as evidenced by the newly-obtained medical records his hypertension, hyperlipidemia, obesity, history of type 2 diabetes, and pneumonia, combined with his previously-known heart attack and open heart surgery, evidence serious deterioration; and he has served 25 years in prison (PSI at 1). Finally, any combination of the reasons presented by Mr. Israel satisfies the catchall provision. Thus, Mr. Israel satisfies each of these three Guidelines' subsections, and provide this Court with additional bases to grant him compassionate release.

**3.   As demonstrated by the recent numbers and reported by local news and staff, the pandemic is ripping through FCI Miami, which has reported 106 positive cases as of July 21, 2020, but has also only tested 182 inmates—resulting in a <u>58% positivity rate</u>.**

---

district court directly without clearance from the BOP. As such, U.S.S.G. § 1B1.13 is merely advisory and does not bind the Court's application of § 3582(c)(1)(A).").

9

FCI Miami is indisputably in the clutches of this pandemic. As of July 10, 2020, FCI Miami reported 16 inmate positives and 6 staff positives.[24] But just the day before, on July 9, 2020, an FCI Miami staff member sounded the alarm, going public and revealing that "'Yesterday alone we discovered in one area that held 60 inmates over 22 tested positive and that's only after testing 28,' he said. 'We don't know where this is going to lead but it looks catastrophic at the moment.'"[25] Going on the defensive, the BOP "released a lengthy statement saying in part, 'There were not 22 or 28 inmates positive with COVID-19 at FCI Miami this week. There are only 16 inmates positive with COVID-19 at this institution.'" *Id.*

Yet, on July 14, 2020, there were 20 positive tests at Miami FCI. One day later, on July 15, 2020, the BOP COVID-19 tracker reported an **astounding 79 positive COVID-19 tests.** Another day later, the morning of July 16, 2020, the count again increased, to **91 positive cases.** By the evening of July 16, 2020, the count again increased to **101 positive tests.** [26]

At this point, FCI Miami has an infection positivity rate of 58%. This is because it continues to rampantly undertest. FCI Miami reports that as of July 22, 2020, there are 106 reported positive cases, and it has tested only 182 inmates out of 993. An accurate positivity rate cannot be calculated by dividing reported positive cases by the entirety of the prison population, because that would assume that the entire population has been tested. An accurate positivity rate can only be calculated by dividing the number of positive inmates by the number of tested inmates.

This principal is demonstrated by Florida Department of Health's own calculation and reporting of Miami-Dade County's current positivity rate:

---

[24] Available at https://www.bop.gov/coronavirus/ (visited July 10, 2020).
[25] Willard, Shepard, *South Florida Federal Corrections Officers Warn of Potential Coronavirus Crisis Brewing,* (July 9, 2020) (available at https://www.nbcmiami.com/news/local/south-florida-federal-corrections-officers-warn-of-potential-coronavirus-crisis-brewing/2260242/ (visited July 16, 2020).
[26] https://www.bop.gov/coronavirus/ (visited July 16, 2020) (emphasis added).

**COVID-19: All persons with tests reported**
Data through Jul 16, 2020 verified as of Jul 17, 2020 at 09:25 AM
Data in this report are provisional and subject to change.

The table below includes persons with laboratory results that the Department of Health has received electronically or by mail/fax for Florida residents and non-Florida residents.

| County | Awaiting testing | Inconclusive | Negative | Positive | Percent positive | Total tested |
|---|---|---|---|---|---|---|
| Dade | 184 | 882 | 392,627 | 77,867 | 17% | 471,376 |

https://floridadisaster.org/globalassets/covid19/dailies/state_reports_20200717.pdf (visited July 22, 2020). So again, just like the State of Florida has calculated Miami-Dade's positivity rate by dividing the number of positive cases by the number of confirmed tests to calculate a 17% positivity rate, the positivity rate for FCI Miami is calculated by taking the number of reported positives (106) and dividing by the number of confirmed tests (182), equaling a 58% positivity rate at FCI Miami.

In addition to the numbers above, FCI Miami is mismanaging the situation. As demonstrated by Mr. Israel's records, he was symptomatic for two days before he was tested. Ex.1 at 2. Testing an inmate after he is symptomatic inmates does not allow for timely isolation and decrease in spread. Rather, for at least four days—the 48 hours before his symptoms appeared, and the 48 hours during which he was symptomatic—Mr. Israel was in general population and interacting with staff and inmates. FCI Miami's mismanagement placed both inmates and staff at risk.

The government advises that it opposes Mr. Israel's release because it claims: (1) he is safer inside FCI Miami; and (2) to release him would pose a risk of infection to the Miami-Dade community. Both of these assertions are incorrect and contrary to science and data. First, there is no evidence that Mr. Israel would be safer in FCI Miami. That was the government's claim when Mr. Israel was negative, and now he has contracted this deadly disease while in custody of FCI Miami. In fact, the scientific evidence is that Mr. Israel would be safer in a home with Ms. Israel.

As one epidemiologist explained, "COVID-19 poses a serious risk to inmates and workers in detention facilities." Ex.4 at ¶11 (Beyrer Declaration). Prison features that "heighten risks for exposure" include "insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene." *Id.* at ¶14. "Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure." *Id.* at ¶15.

Social distancing and the necessary steps to deploy the needed hygiene is simply not possible in a prison setting. As another infectious disease doctor, biostatistician, and epidemiologist, has explained, "jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above." Ex.5 at ¶23 (Meyer Declaration). Moreover, "[r]educing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities *and for the community at large.*" Ex.5 at ¶37 (Meyer Declaration) (emphasis added). Most prisons are not medical facilities, and they are not equipped to handle outbreaks of infectious diseases spreading through large portions of the population. *See* Ex.5 at ¶14 (explaining that the "risk posed by infectious diseases in jails and prisons is significantly higher than in the community" in terms of "harm to individuals who become infected," and that "[j]ails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks").

Second, Mr. Israel's release will not present a risk of spreading infection to the community. Each BOP facility has a protocol for release after positive test for COVID-19. These protocols are typically developed in conjunction with the local health departments. The Court can thus condition his release on Mr. Israel meeting that protocol. Doing so decreases, rather than increases, the risk to the community. *See United States v. Arreola-Bretado*, No. 3:19-CR-03410-BTM, ___ F.Supp.3d ___, 2020 WL 2535049 (S.D. Cal. May 15, 2020) (granting compassionate release to

COVID-19 positive defendant after finding that returning defendant to her family is safer to the community than keeping her confined, where she will likely be a risk to other inmates and staff who have not yet contracted COVID-19).

Indeed, numerous courts nationwide have recently granted compassionate release to COVID-19 positive defendants on these and similar grounds. *See, e.g.*, *United States v. Vasquez Torres,* Case No. 19-cr-20342-Bloom, DE58 (S.D.Fla. July 10, 2020) (granting renewed motion for compassionate relief where, after court's initial denial, defendant (1) contracted COVID-19 and (2) the government's policy changed to allow it to concede "extraordinary and compelling" reasons exist where defendants have CDC factors); *United States v. Barber,* 18-cr-00446-AA, DE55 (D. Or. May 12, 2020) (granting compassionate release to defendant with diabetes, hypertension, and obesity, explaining that "not only has defendant shown that he is particularly vulnerable to complications from COVID-19, he has also tested positive for the illness"); *United States v. Huntley*, No. 13-cr-119-ABJ, DE263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated); *United States v. Fischman*, 16-cr-00246-HSG-1, DE76 (N.D. Cal. May 1, 2020) (granting compassionate release from Terminal Island to COVID-19 positive defendant); *United States v. Kriglstein*, 1:16-cr-00663-JCH-1, DE60 (D.N.M. Apr. 27, 2020) (staying for 5 days release of defendant who was tested for COVID-19 as condition of order granting compassionate release, with positive result);  *see also Yeury J.S. v. Decker*, Case No. 2:20-cv-5071-KM, DE20 (D.N.J. May 11, 2020) (ordering release for COVID-19 positive immigration detainee).

Courts around the country have rightly rejected the government's "safer in prison" approach. *See United States v. Robinson*, Case No. 3:10-cr-261, DE 86: 10 (E.D. Va. July 17, 2020)

(rejecting government's argument that inmates are safer in prison than in communities with ongoing spread and noting BOP appears to be testing only the sickest inmates and is therefore likely dramatically undercounting the number of sick inmates in custody); *United States v. Agomuoh*, 2020 WL 2526113, at *8–9 (E.D. Mich. May 18, 2020) (Levy, J) ("[I]t is irrelevant whether Defendant could contract COVID-19 outside of FCI Morgantown. The pertinent question is whether there is some product of Defendant's combined medical conditions and conditions of confinement that "substantially diminish" his ability to provide self-care "within the environment of a correctional facility"); *Coreas v. Bounds*, 2020 WL 1663133, at *5 (D. Md. Apr. 3, 2020) (characterizing the "claim that someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty" as "an absurdity"). Given the rising COVID-19 rates at FCI Miami, and Mr. Israel's infection with COVID-19—which happened while he was in the care and custody of FCI Miami—this Court should likewise reject the government's "cynical and illogical position that a defendant is 'safer in prison' as a reason to support detention." *See United States v. Sanders*, 2020 WL 2320094, at *8 (E.D. Mich. May 11, 2020).

This pandemic is a community health issue, and that community includes the prisons and its staff, who move between the inmates and us. This is not simply a matter of keeping infected or exposed inmates walled off. The scientific expert advice is that we must place individuals in environments where social distancing is possible. That environment is inside Ms. Israel's home, not inside a prison, where social distancing is impossible.

**5.    Mr. Israel is not a danger to the community.**

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. §3553(a) to determine whether a sentencing reduction or modification

14

is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, Mr. Israel's advanced age, compromised physical health, his having been infected with COVID-19, and his increased risk of becoming severely ill, when combined with the other Section 3553(a) sentencing factors, clearly warrant relief.

*First*, Mr. Israel's convictions were for drug conspiracy and for money laundering. Thus, while his offense conduct was certainly serious, it involved neither weapons nor allegations of violence. The Presentence Investigation report contains no mention of weapons, firearms, or physical violence, either. *Second*, at the time of his sentencing in 1995, Mr. Israel was 52 years old and had zero criminal history points. He was in Criminal History Category I. *Third*, he is fortunate to have a stable home to be released to, with family who are willing and able—both mentally, physically, and financially—to assume responsibility for him and his illnesses. *Fourth,* he has served 25 years in prison, which does not diminish the seriousness of his offense, and at the age of 76 years old, with no teeth, and a body ravaged by continued illness, he is no danger to anyone and certainly, a deterrent to look upon.

## CONCLUSION

Given Mr. Israel's advanced age, hypertension, serious cardiac history, hyperlipidemia, and other health issues, like pneumonia, obesity, and history of type 2 diabetes, he is exceptionally vulnerable to complications from COVID-19—which he has contracted while in the custody and protection of FCI Miami—and he has demonstrated "extraordinary and compelling reasons" to GRANT his renewed motion for compassionate release under Fed. R. Civ. P. 59(e) and 18 U.S.C. § 3582(c)(1)(A); or in the alternative, GRANT his second motion for compassionate release; and GRANT his unopposed motion for expedited briefing of this matter, requiring the government's response in 7 days and Mr. Israel's reply in 3 days.

Dated: July 23, 2020                             Respectfully submitted,

>
> TACHE, BRONIS, CHRISTIANSON AND
> DESCALZO, P.A.
> 150 S.E. 2 Avenue, Suite 600
> Miami, Florida 33131
> Telephone: (305) 537-9565
> Facsimile: (305) 537-9567
>
> By: */s/ Marissel Descalzo*
>     Marissel Descalzo, Esq.
>     Florida Bar No. 669318
>     mdescalzo@tachebronis.com
>     service@tachebronis.com
>     *Counsel for Raul Israel*

## **CERTIFICATE OF SEVICE**

I CERTIFY THAT on this 23rd day of July, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, thereby serving all counsel of record in this case.

>
> By: */s/ Marissel Descalzo*
>     Marissel Descalzo, Esq.