## **Declaration of Dr. Jaimie Meyer**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

### I. Background and Qualifications

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine. I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut. In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility. Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole). I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others. I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. I am being paid $1,000 for my time reviewing materials and preparing this report.

6. I have not testified as an expert at trial or by deposition in the past four years.

### II. Heightened Risk of Epidemics in Jails and Prisons

7. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

8. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

9. <u>Reduced prevention opportunities:</u> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

10. <u>Disciplinary segregation or solitary confinement is not an effective disease containment strategy.</u> Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff.

11. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have

    access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility</u>: People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety</u>: As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

18. <u>Safety and security:</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

work.  Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

19. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2]  Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed.  During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

### III.    Profile of COVID-19 as an Infectious Disease[4]

20.  The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19.  The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces.  People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve.  In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet.  Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the general public.  Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer.  People in prison and jail will likely have even less access to these novel health strategies as they become available.

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.

[4] This whole section draws from Brooks J.  Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5] Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6] Death in COVID-19 infection is usually due to pneumonia and sepsis. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7] People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation. Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Jails and prisons are totally under-resourced to meet the demand for any of these strategies. As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease. Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now. Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19. News outlets reported that Iran temporarily released 70,000 prisoners when COVID-19 started to sweep its facilities.[8] To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*. The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[8] *Iran temporarily releases 70,000 prisoners as coronavirus cases surge*, Reuters (March 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

place.[9]  Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

## IV. Risk of COVID-19 in ICE's NYC-Area Detention Facilities

25. I have reviewed the following materials in making my assessment of the danger of COVID-19 in the Bergen, Essex, Hudson, and Orange County jails ("ICE's NYC-area jails"): (1) a declaration by Marinda van Dalen, a Senior Attorney in the Health Justice Program at New York Lawyers for the Public Interest (NYLPI); (2) the report *Detained and Denied: Healthcare Access in Immigration Detention*, released by NYLPI in 2017; and (3) the report *Ailing Justice*: *New Jersey*, *Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention*, released by Human Rights First in 2018.

26.  Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. The reasons for this conclusion are detailed as follows.

27. The delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.

28. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions.

29. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.

30. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.  Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes.  Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation.

---

[9] Luke Barr & Christina Carrega, *State prisons prepare for coronavirus but federal prisons not providing significant guidance, sources say*, ABC News (March 11, 2020), https://abcnews.go.com/US/state-prisons-prepare-coronavirus-federal-prisons-providing-significant/story?id=69433690.

31. Failure to keep accurate and sufficient medical records will make it more difficult for the facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection. Inadequate screening and testing procedures in facilities increase the widespread COVID-19 transmission.

32. Language barriers will similarly prevent the effective identification of individuals who are particularly vulnerable or may have symptoms of COVID-19. Similarly, the failure to provide necessary aids to individuals who have auditory or visual disabilities could also limit the ability to identify and monitor symptoms of COVID-19.

33. The commonplace neglect of individuals with acute pain and serious health needs under ordinary circumstances is also strongly indicative that the facilities will be ill-equipped to identify, monitor, and treat a COVID-19 epidemic.

34. The failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic.

35. For individuals in these facilities, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

### V.    Conclusion and Recommendations

36. For the reasons above, it is my professional judgment that individuals placed in ICE's NYC-area jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness (pneumonia and sepsis) and even death.

37. Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large.

38. As such, from a public health perspective, it is my strong opinion that individuals who can safely and appropriately remain in the community not be placed in ICE's NYC-area jails at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release.

39. This is more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 60. They are in even greater danger in these facilities, including a meaningfully higher risk of death.

40. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for COVID-19 in these facilities is a matter of days, not weeks. Once a case of

      COVID-19 identified in a facility, it will likely be too late to prevent a widespread outbreak.

41. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.

I declare under penalty of perjury that the foregoing is true and correct.

March 15, 2020  
New Haven, Connecticut

                                                        Dr. Jaimie Meyer